Filed 1/9/14  In re Joseph B. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re JOSEPH B., a Person Coming Under the Juvenile Court Law. | |
| | D064328 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1118) |
| v. | |
| ANGELO B. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant Angelo B.

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and Appellant Jamie M.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

Angelo B. and Jamie M., the parents of Joseph B., appeal the juvenile court's jurisdiction and disposition order under Welfare and Institutions Code section 300, subdivision (b).[1]  Jamie and Joseph became homeless after they left Angelo following a fight between Jamie and Angelo.  Joseph was detained in protective custody after Jamie checked herself in to a mental health facility reporting that she had thoughts of harming Joseph.  The court determined removal was necessary and it would be detrimental to place Joseph with either parent based upon evidence of mental health issues, substance abuse, and domestic violence.  Angelo challenges the jurisdictional finding that he had been unable to protect and supervise Joseph and further challenges the dispositional finding in which the court declined to place Joseph with Angelo.  Jamie contends there is no substantial evidence to support the court's finding that it would be detrimental to return Joseph to her care, claiming her mental health has stabilized.  We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Detention*

---

[1]     All further references are to the Welfare and Institutions Code unless otherwise indicated.  An order under section 300 is an appealable judgment.  (§ 395, subd. (a).)

2

In January 2013, when Joseph was 11 months old, Jamie, checked herself into a mental health facility reporting she had thoughts of hurting Joseph. Jamie has a history of mental illness including a diagnosis of borderline personality disorder and bipolar disorder requiring medication, which she had not been taking for several months.

Joseph came to the attention of the San Diego County Health and Human Services Agency (Agency) after the Agency's child abuse hotline received a report that Jamie and Joseph had recently moved to San Diego, perhaps to get away from the baby's father. The report indicated that friends watched Joseph because they were scared of what Jamie would do. Jamie had dropped Joseph off in a carrier at a childcare parking lot. She had also been kicked out of her mother's home and they had stayed in several places where drugs were used. The referral stated that Jamie could not cope with the baby and had thoughts of wanting to physically harm him.

Jamie reported to the investigating social worker that her relationship with Joseph's father, Angelo, was very abusive. Angelo would come home high on methamphetamine or alcohol and would hit her and force her to have sex with him. She reported that Angelo beat her up in front of her older daughter.[2]

Jamie and Joseph lived in Nevada with Angelo until June of 2012 when Jamie was escorted from the property by the sheriff following an incident of domestic violence, which Jamie said occurred because she would not allow Angelo to have sex with her.

---

[2]     Jamie has an older daughter from another marriage who lives with her father. Jamie had unsupervised visits with that child until the girl's father reported Jamie was "losing it" during visits. The judge in that case ordered Jamie to continue with her medication, maintain sobriety and to not allow Angelo around her daughter during visits.

After this incident, she and Joseph ended up living out of her car. Jamie felt overwhelmed and had not taken her medications since October 2012 because she was not able to provide an address for Medicaid benefits. Jamie admitted to a history of substance abuse, including use of methamphetamine within recent months.

When Jamie's cousin learned that Jamie and Joseph were homeless, she invited them to stay with her. Jamie arrived in California at the end of December 2012, but had left Joseph in the care of a friend until she could stabilize her mental health. The cousin drove to Las Vegas, Nevada, to get the child. The cousin reported she was concerned that Jamie would go back to Nevada and resume a relationship with Angelo.

Joseph was detained in protective custody due to Jamie's unstable mental health and because there was concern she would flee with Joseph to resume a violent and dysfunctional relationship with Angelo.[3]

Jamie reported having a hard time connecting with the child and feeling a lot of resentment towards him. She saw him as a reminder of a bad relationship and the product of someone who abused and raped her for years. However, she also reported that she loved Joseph, he was her hope, and she felt that she would not have a purpose to live without him.

The social worker confirmed domestic violence episodes with Angelo. In September 2010, both Jamie and Angelo were arrested for domestic battery on each

---

3   Angelo testified that he called child protective services in Nevada around the time Joseph was taken to San Diego. There is no indication in the record that Nevada took any action on this report.

other. Angelo stated he obtained a temporary restraining order against Jamie. In March 2011, Angelo's brother called sheriff deputies reporting Angelo forcibly entered a home and began fighting the residents. Earlier, Angelo had fought with his brother, grabbed his neck and tried to strangle him, but Ryan, one of the residents, intervened. Ryan also intervened in a fight between Jamie and another woman, putting Jamie in a chokehold. Angelo confronted Ryan about the incident and fought with him. The brother reported that every time Angelo drinks alcoholic beverages, he gets very violent.

The Agency filed a petition under section 300, subdivision (b). The detention report recommended Joseph be detained because there was substantial danger to the physical and emotional health of the child and there was no reasonable means by which he could be protected without removing him from the parents' or guardians' physical custody. There was substantial evidence that Jamie was likely to flee the jurisdiction of the court because Jamie wanted to return to Nevada to obtain housing. Jamie had unresolved mental health issues and had been both a victim and perpetrator in domestic violence.

II.

*Detention Hearing*

Since the child had lived out of state within the prior six months, the court exercised emergency jurisdiction over the child at the detention hearing and indicated it would make an inquiry under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (Fam. Code, § 3400 et seq.).

5

At the January 24, 2011 hearing, the court found the Agency made a prima facie showing that Joseph was a child described by section 300, subdivision (b), and that initial removal was necessary.[4]  Detention was necessary because of a substantial danger to the physical health of the child and there was no reasonable means to protect his physical or emotional health without removing him from parental custody.  The court ordered the Agency to evaluate Jamie's cousin's home for placement.  If Joseph was to be placed with the cousin, the court gave the social worker discretion to allow Jamie to reside in the home, but in a supervised setting, and only if Jamie was actively engaged in services.

III.

*Jurisdictional Hearings*

In February 2013, Jamie supported placement with her cousin and "vehemently expressed that she would not want [Angelo] to be considered for a possible placement option."  Angelo, however, wanted Joseph placed with him and stated he could provide his son with a stable and nurturing home.  The Agency's jurisdiction/disposition report

---

4      Section 300 provides in pertinent part: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  [¶] . . . [¶]  (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse. . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."

6

informed the court Joseph had not yet been placed with Jamie's cousin because Jamie was living in the home and she was not actively engaged in services.

At the February 14, 2013 hearing, Angelo appeared through appointed counsel and entered a denial to the petition. The court ordered the Agency to provide voluntary services to Angelo and allowed telephonic or Skype visitation. The court indicated it would make the appropriate inquiry with Nevada regarding the UCCJEA and would set a special hearing regarding this issue. After discovering that no proceedings had been filed in Nevada regarding this child, the court proceeded with jurisdiction.[5]

Jamie later moved out of the cousin's home to accommodate Joseph's placement with the cousin. He did well and Jamie had liberal supervised visits.

In March 2013, the court found the allegations in the petition true and sustained the jurisdictional allegations under section 300, subdivision (b). The court noted that disposition was contested by both parents. The Agency recommended that Joseph remain placed with the cousin and that Jamie receive reunification services, but live out of the

---

[5]     At a special hearing, the court informed the parties that it had contacted the chambers of the presiding judge for Clark County, Nevada and learned there were no family or juvenile cases regarding Joseph. The Nevada court provided information about a case regarding Jamie's daughter from a previous relationship. An order was entered precluding Jamie from having any contact with Angelo during her visits with her daughter. The order required Jamie to continue treatment with her psychiatrist, to stay on her medications and to stay clean and not use any illegal drugs. The California juvenile court in this case interpreted the UCCJEA as requiring it to confirm that there are no pending cases regarding the child in the home state jurisdiction and that if, after that inquiry is made, the other court does not assert jurisdiction and no parent or other individual files an action in the other state, then the California court may proceed. The court indicated that if one of the parents filed a proceeding in another state, then the UCCJEA inquiry would be raised again. No party objected.

home.  Jamie asked that she be allowed to move into the home with Joseph or that the child be placed with the cousin.  Because Angelo requested custody, the Agency requested an expedited evaluation of Angelo's home pursuant to the Interstate Compact on the Placement of Children (ICPC). (Fam. Code, § 7901 et seq.).

IV.

*Contested Disposition Hearings*[6]

A.

While Jamie participated in services for several months, Jamie sent a number of concerning text messages in April 2013 indicating she intended to kill herself.  In May, she moved back to Las Vegas, Nevada.  She now hoped Joseph would be placed with Angelo.

In a May home interview, a Nevada social worker reported that Angelo initially stated he had been sober since 2010, but then admitted to drinking at least a "six-pack a week."  The social worker also observed that he appeared anxious and exhibited symptoms similar to withdrawal symptoms, such as tics and sweating profusely.

B.

When the contested disposition hearing proceeded in June 2013, Angelo admitted he had three convictions for driving under the influence (DUI) in the 1990's, the third being a felony.  In 2002 his probation was revoked after he tested positive for methamphetamine and he served 16 months in prison.

---

[6]     The contested disposition hearing was continued several times to obtain an ICPC report from Nevada of Angelo's home.

He claimed he went to a voluntary treatment program for 28 days when he worked for a commercial airline in Texas. He also said he participated in Alcoholics Anonymous (AA) meetings, but he stopped attending AA meetings in 2005 claiming he had not had anything to drink for eight years.

He was convicted of a misdemeanor DUI in Las Vegas in 2009. He claimed he had his grandmother's prescription pain medicine when he was pulled over. However, he obtained the DUI after he tested positive for marijuana. He was placed on a three-year probation, which again required classes.

Angelo admitted he told the Nevada social worker that he drinks "a six-pack a week." He testified, however, that he only drinks three or four drinks when he goes to karaoke. He denies drinking and driving and denies that he drinks when the children are around. During the same interview in Nevada, Angelo reported for the first time that he had been treated for bipolar disorder and last took medication for that condition in 2004.

Angelo was arrested for domestic violence with Jamie in 2010 in which they both claimed to be the victim. Angelo was also arrested following the altercation with his brother in March 2011. He pleaded to a lesser charge and paid a fine.

Angelo asked the court to place Joseph with him arguing that he did not do anything wrong to have Joseph kept from him. He believed he was in the best position to take care of Joseph and he has a support system. If given custody of Joseph, he could bring Joseph to work with him at his mother's real estate office, where other relatives would care for him or he would put Joseph in daycare.

9

Angelo testified that if Joseph was placed in his care, he would be willing to refrain from the use of alcohol or controlled substances, participate in AA or Narcotics Anonymous (NA) meetings and participate in random drug testing.

Angelo was aware that Jamie moved back to Nevada and he had no problem with Jamie having visits. Angelo testified he speaks to Jamie all the time by phone or by text. He socialized with her since she returned to Nevada. She has a job and he helped her out with a place to stay.

Angelo planned to go to Texas during the summer to stay with his ex-wife and Joseph's half-brother and two half-sisters while the kids were out of school. He also wanted to assist his daughter, who has cerebral palsy, after a scheduled surgery. He denied that there would be any domestic violence issues between him and his ex-wife.

The court found it would be detrimental to place Joseph with Jamie. While Jamie did actively participate in voluntary services, the court was concerned that she moved back to Las Vegas and removed herself from services and assistance. The court was also concerned about the suicide threats, which suggested Jamie was not able to provide stable and protective care for her child.

The court also found it would be detrimental to place Joseph with Angelo at the time, but requested additional information to consider Angelo's placement request. The court based its finding on Angelo's significant substance abuse history including a series of DUI's that the court described as "very troubling and clearly escalating."

The court also found detriment based upon Angelo's history of domestic violence with Jamie, including an incident of violence in the presence of a child. The court stated,

10

"What is particularly concerning to the court is what I assessed, after having watched father on the stand, is his lack of insight of his role in terms of the domestic violence. The reports before the court are quite clear. Father blanketly denies—and I have concerns about his credibility at this point—that he was ever physical with mother, that he hit mother, although, she had very significant bruising, and reported on more than one occasion that father had been violent towards her. [¶] Father's assessment of this was that he was, essentially, the victim at all times, and would, essentially, allow her back in . . . his life. The reason I find this troubling as to the question of placement today of Joseph with the father is that nothing has been addressed with respect to father's view of domestic violence. [¶] And while he gave the court some explanations . . . generally how domestic violence can impact a child, he does not seem to have an awareness about protecting himself and his role in terms of protecting Joseph. [¶] Moreover, the court also has concerns about the father's ability to accurately assess mother's situation. And even when he thinks that she is in a mental health crisis, he continues to engage with her."

The court was also concerned that Jamie and Angelo were now living in proximity to each other again and were communicating. The court concluded it had real concerns, "based on the record before me today, that there is not a protective system in place such that Joseph could be put with father, can be protected from domestic violence, verbal and otherwise between the parents."

The court ordered Angelo be drug tested, he enroll in a domestic violence program, and his case plan include a full substance abuse assessment. The court also

11

wanted additional information about services available to Jamie and what services might be available to Angelo in Texas if he went there for an extended visit. The court continued the disposition hearing for this additional information.

C.

Prior to the next hearing, Jamie submitted information indicating she was accessing services in Nevada, she was no longer homeless, and she had a weekly income. The social worker noted that, based on recent telephone conversations, Jamie's mental health appeared to be stabilized. She was more lucid and routinely expressed interest in Joseph's well being. The social worker, however, wanted to speak with Jamie's psychiatrist before recommending unsupervised visits.

Angelo completed a chemical dependency assessment in Texas, which indicated he meets the criteria for dependence, but that he is in sustained remission. He also submitted to random drug testing, which was negative. Angelo was enrolled in, but had not yet started, a domestic violence program in Texas. The Nevada report made the home study contingent on completion of a drug and alcohol evaluation, a mental health evaluation and proof of employment.

D.

At the continued hearing on July 23, 2013, Angelo was living in Texas with his ex-wife and their children. He was getting paid by Texas to act as a caregiver for his special needs daughter. While he and his ex-wife were discussing getting back together, there were no immediate plans for reunification.

Jamie now opposed placement with Angelo because he was not living in Nevada and she was concerned that Angelo needed to obtain the services recommended by the Agency. She also requested reunification services with Joseph.

The court denied Angelo's request for reconsideration of the detriment finding. While the court commended Angelo for the steps he had taken, the court indicated that the same concerns existed as they did at the contested jurisdiction hearing and the court wanted a completed ICPC evaluation. The court also wanted confirmation of attendance at AA or NA meetings, as well as alcohol and drug testing and reports regarding his domestic violence treatment.

The court granted Angelo an extended visit with Joseph so that he could spend vacation time with his half-siblings and could visit relatives, including his mother in Las Vegas. The court ordered that Joseph's visit with his mother be supervised by someone other than Angelo.

The court reiterated its findings for removing Joseph from Jamie and making a detriment finding as to Angelo. The court ordered the Agency to prepare a case plan for Angelo and an ICPC for Jamie.

## DISCUSSION

### I.

*Substantial Evidence Supports the Jurisdictional Finding*

### A.

"A dependency proceeding under section 300 is essentially a bifurcated proceeding. The court first determines whether the minor is a dependent child subject to

13

the jurisdiction of the court within the description set out in section 300. . . . [¶] Once the court has determined the minor is a person described by section 300 and has assumed jurisdiction it 'shall then proceed to hear evidence on the question of the proper disposition to be made of the minor . . . .' (§ 356.) . . . Before a dispositional order which awards custody to a nonparent without the consent of the parents can be rendered, there must be a clear and convincing showing an award to the parents would be detrimental to the child and that an award of custody to a nonparent is essential to avert harm to the child and required to serve the best interests of the child." (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 535, italics omitted.)

At the jurisdiction phase, under section 355, subdivision (a), the Agency is required to " 'prove by a preponderance of the evidence that the child who is the subject of a petition comes under the juvenile court's jurisdiction.' " (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379.) "The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm." (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.) For the court to exercise jurisdiction under section 300, subdivision (b), there must be "evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 823.)

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings. [Citations.] The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid

value."  (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)  "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence.  We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence.  [Citations.]  Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact."  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

## B.

Angelo argues on appeal that there was no substantial evidence to support the jurisdictional finding that he was unable to protect and supervise Joseph.  Angelo did not raise this argument before the juvenile court.  Instead, at the jurisdiction hearing, his counsel merely requested that the petition be amended to strike the word "failed" from the petition, arguing that he did make a report once he learned Joseph had been taken from Nevada.  The court amended the petition as requested leaving the allegations that Angelo had been unable to protect and supervise Joseph.  The court sustained the petition and made a true finding of jurisdiction under section 300, subdivision (b).  Angelo's acquiescence waived his right to claim error as a basis for reversal on appeal.  (*In re N.M.* (2011) 197 Cal.App.4th 159, 166 ["It is well settled that attacks on the legal sufficiency of a petition cannot be made for the first time on appeal"]; see also *In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 1002 [" 'An appellate court will ordinarily not

consider procedural defects or erroneous rulings . . . where an objection could have been, but was not, presented to the lower court by some appropriate method. [Citations.]' [Citation.] Failure to object to the ruling or proceeding is the most obvious type of implied waiver"].)

Even if Angelo did not forfeit the right to challenge the sufficiency of the evidence regarding jurisdiction, he cannot prevail on such a claim. The purpose of dependency proceedings is to protect children, not to punish the parents. "Therefore, the court takes jurisdiction over children (§ 300); it does not take jurisdiction over parents. Moreover, the court has jurisdiction over the children if the actions of *either* parent bring the child within one of the statutory definitions in section 300. [Citation.] The court gains jurisdiction over a parent when the parent is properly noticed. [Citation.]" (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 202, italics added.)

In this case, Angelo does not dispute that the Agency properly sought detention of Joseph when Jamie was in a state of distress. At the time of the jurisdictional hearing, the court had information regarding Jamie's unresolved mental health issues as well as her history of substance abuse and domestic violence charges. This alone was sufficient for the court to take jurisdiction over the child.

In addition, however, there was evidence that Angelo was unable to protect or supervise Joseph. Jamie's reports of domestic violence at the hands of Angelo were confirmed by police reports, and an order from another court prohibiting Angelo from having contact with Jamie during visits with her daughter. Additionally, the Agency expressed concern about placement with Angelo due to his criminal history.

16

Angelo argues that he "took appropriate steps when mother left the state with Joseph" by filing a report with child welfare officials in Nevada in December and by "refus[ing] to continue his relationship with mother, due to her behavior." However, as the court pointed out, there is no indication that Angelo intervened to care for or protect Joseph during the months that Jamie and Joseph were homeless in Nevada when they were bouncing from house to house. It also does not appear that Angelo came to see the child until March 2013, months after he was detained.

Based upon the record in this case, we conclude there was substantial evidence to support the court's jurisdictional finding.

## II.

### *Substantial Evidence Supports the Court's Dispositional Finding*

#### A.

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision." (*In re N.M., supra,* 197 Cal.App.4th at p. 169.) "A removal order is proper if based on proof of a parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances." (*Id.* at pp. 169-170.)

17

"Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. [Citations.] There must be clear and convincing evidence that removal is the only way to protect the child." (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 170.)

While the parents emphasize the requirement for the juvenile court to find "clear and convincing" evidence of detriment before ordering removal at a disposition hearing, this is not the standard applied on appeal. We again apply the substantial evidence rule to review the court's factual determination regarding disposition. As we have explained, " 'on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' [Citation.] 'We have no power to judge the effect or value of the evidence, to weigh the evidence [or] to consider the credibility of witnesses . . . .' " (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581, fn. omitted.)

As with the jurisdiction finding, the evidence supports the disposition finding. The record shows that the court carefully considered the evidence and weighed the credibility of the witnesses in making its determination that it would be detrimental to place Joseph with either parent at the time. We agree with the juvenile court that it is commendable that both parents have accessed services and appear to be making strides to

18

improve their situations.  However, at the time of the disposition hearings, the court had serious ongoing concerns about the ability of either parent to protect and care for Joseph.

B.

Unlike in *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1751, where a therapist had only vague concerns about parenting insights, in this case Jamie has a documented mental illness that requires medication and treatment.  While she did seek treatment, she left California without completing that treatment and her therapist expressed concern about her mental health and the ability for her to provide a safe residence for Joseph.  This along with the fact that she sent a series of suicide notes before moving back to Nevada was substantial evidence to support the court's conclusion that Jamie was significantly unstable to provide stable and protective care for Joseph at the time.  The fact that Jamie has since accessed care in Nevada and appears to have had some success in stabilizing her mental health is positive and may lead to reunification, but that issue is not before us.

C.

With regard to Angelo, the court acknowledged that under section 361.2 it was required to consider placement with him as the noncustodial parent unless it found by clear and convincing evidence that placement with that parent would be "detrimental to the safety, protection, or physical or emotional well-being of the child."  (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829.)  The court made this finding and it is supported by substantial evidence.

19

The record supports the court's concern about Angelo's long history of substance abuse, going back to his teens, and dependency upon multiple substances, which led to criminal behavior and interfered with his ability to maintain employment. The court had justifiable concerns that even after three DUI convictions, Angelo violated his probation by testing positive for methamphetamine. Then, after serving time in prison for the violation, he again tested positive for driving under the influence of marijuana. While Angelo claims he has been sober since 2010, he disclosed to a Nevada social worker that he still engages in social drinking every week while playing games or going to bars.

The Legislature recognizes that providing children with "a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.) It is for this reason that the court properly required Angelo to participate in a complete substance abuse assessment as well as drug and alcohol testing and documentation of his participation in AA and NA meetings.

The record also supports the court's finding based upon concerns about domestic violence. While Angelo suggested that the incidents of domestic violence with Jamie were due to her mental health issues and that he was the victim, the court did not find his testimony credible. Even if his testimony were to be believed, the court found it troubling that Angelo would continue to engage with Jamie, particularly while he is seeking placement of the child. In addition, there was evidence that Angelo's ex-wife left him after an incident where Angelo became physical and it scared her enough to call the

police. At the time of the continued disposition hearing in July 2013, Angelo had not yet started a domestic violence program.

Under these circumstances, the court properly found detriment to place with Angelo and ordered him to address both the domestic violence and substance abuse issues.

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

McDONALD, J.

IRION, J.

21